## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAWN L. BROWN,** | : | **Civil No. 1:15-CV-918** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **COMMONWEALTH OF** | : | |
| **PENNSYLVANIA, DEPT. OF** | : | |
| **CORRECTIONS, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

## I.   Introduction

Workplace strife can take many forms and have many causes. However, not every incident of job-site discord rises to the level of a constitutional infraction.

So it is here. This action was brought by the plaintiff, Dawn Brown, a former correctional officer in the Pennsylvania Department of Corrections ("DOC"), against the DOC and several of its employees. Brown alleges that she was retaliated against by the DOC and its employees in violation of her First Amendment rights when she was terminated in July of 2015. A four-day nonjury trial was held in front of the undersigned in June of 2021. After consideration of the testimony and evidence produced at trial, we find that the plaintiff has failed to prove that the defendants

violated her First Amendment rights.[1] Therefore, for the following reasons, we will enter judgment in favor of the defendants against the plaintiff.[2]

## II.   <u>Background</u>[3]

Brown began her employment as a correctional officer with the DOC in 2005, and she was assigned to the State Correctional Institution at Camp Hill. Between December 2014 and July 2015, Brown made numerous complaints and reported what she believed to be inappropriate behavior and wrongdoings, both to her superiors and to third party agencies. These complaints included, but were not limited to, allegations of inmate-staff relationships, the introduction of contraband into the facility, the use of cell phones by inmates, and the DOC's failure to separate Brown from certain inmates. Brown made these reports to DOC staff as well as outside agencies, including the FBI, the Governor of Pennsylvania, and the United

---

[1] Brown represented herself at trial, her prior counsel in this protracted litigation having either died or withdrawn. While we find in favor of the defendants, we commend Ms. Brown for the thorough preparation of her case. We also commend defense counsel for the skill of their presentation, and for the many professional courtesies they extended to Ms. Brown in the course of these proceedings.

[2] The DOC and Defendant Noll were dismissed with respect to the First Amendment retaliation claim at the summary judgment stage. (Doc. 95). Additionally, at trial, Brown conceded that she had not carried her burden to show that Defendant Kuzar violated her First Amendment rights, and judgment was entered in favor of Defendant Kuzar. (Doc. 226).

[3] This factual background is taken from the evidence and testimony elicited at trial and represents the facts which we find were established by a preponderance of the evidence.

2

States Attorney's Office. Brown also posted about these alleged wrongdoings on her two Facebook pages.

On December 3, 2014, Brown submitted a request to be separated from an inmate named Darrell Heizman. This separation request arose from a complaint that Brown had made regarding Heizman's relationship with a staff member, Melissa Griffin.[4] According to Brown, she had reported this relationship as far back as 2010, and she claimed that she needed separation from Heizman when he returned to SCI Camp Hill in 2014. While Deputy Meintel had no recollection of this separation request, we credit Brown's testimony that she had informed Deputy Meintel of this separation request, which was apparently never granted. However, Meintel stated that he was not aware of any relationship between Griffin and Heizman or how it related to any separation request Brown may have made.

---

[4] It appears that the plaintiff had some personal disputes with Ms. Griffin, a former colleague, spanning well beyond Griffin's termination in 2011. Brown had reported Griffin's relationship with this inmate in 2010 and continued to report the relationship even after Griffin's termination in 2011, including posting on her Facebook page. However, Defendant Kertes testified that he investigated this staff-inmate fraternization after the inmate, Darrell Heizman, self-reported the relationship while he was housed at SCI Chester, and that Brown's complaints and posts had nothing to do with the investigation. Kertes stated that his investigation resulted in Griffin's termination due to her relationship with an inmate. Thus, while it is undisputed that Ms. Griffin was terminated for this inappropriate behavior in 2011, her relationship continued to be the subject of Brown's complaints and social media posts well after Griffin was terminated.

The following day, December 4, 2014, Deputy Meintel and Major John Horner conducted an inspection of J Block, where Brown was assigned to work, although it is undisputed that Brown was not working that day. Meintel testified that block inspections were a weekly occurrence to ensure that the cell blocks were maintained and safe. During the December 4 inspection, Meintel found what appeared to be a piece of human feces on the floor of J Block.[5] Thus, the Unit Manager, Ian Taggart, was called over to discuss the issue, and the cell block floor was eventually cleaned up. Taggart later emailed Meintel and Horner, advising them that the block had been cleaned up and that he would fix the issues with his block. Taggart also sent an email to the officers assigned to J Block, including Brown, advising them of what had occurred and informing them that they needed to do a better job taking care of the block.

Even though there was no indication that Meintel's instructions related in any way to Brown, who was not on duty when this incident occurred, Brown perceived the instruction to clean the unit as retaliation against her and pursued an erratic course of action. In response to Taggart's email, Brown took it upon herself to email Deputy Meintel directly, accusing him of using the block inspection as a way of

---

[5] Curiously, much time and attention during trial was devoted to a discussion of whether the substance found on the floor of J Block was actually human feces or a piece of Nutraloaf. We note that while the outcome of that debate was never ultimately reached, we find that this exercise in fecal forensics is immaterial to our decision on the plaintiff's First Amendment claim.

retaliating against her for reporting and speaking out about alleged wrongdoings at SCI Camp Hill. Taggart immediately asked Brown to retract her email and advised her that her email was inappropriate and could create tension within the workplace. For his part, Meintel did not respond to the email, but a factfinding was initiated in early January 2015 after Major Horner, who was copied on Brown's email, reported the email for a possible ethics code violation.

In addition, three weeks later, on December 25, 2014, Brown was mandated to work an overtime shift by Captain Kuzar. Captain Kuzar testified that he had mandated several other officers to work overtime that day, and that Brown refused to work a mandatory overtime shift. Mandatory overtime is a necessary part of corrections work compelled by institutional security needs, and all correctional staff are informed of their duty to follow orders when they are instructed to work overtime. Kuzar explained that the way in which employees were chosen to be mandated was based on a seniority roster and a mandate list, both of which had to take into account employees who had the day off. Thus, Kuzar explained that he received the updated mandate list that day, and he mandated eight employees to work an overtime shift. Brown was the only employee to refuse, and Kuzar then had to mandate CO Killeen in her place. For her part, Brown stated that she told Captain Kuzar that she had FMLA leave, and so she did not think she was required to work mandatory overtime. Kuzar testified that in his entire career, only two employees

ever refused to work mandatory overtime, including this December 2014 incident with Brown, and he submitted incident reports for both of these employees. Thus, by December 25, 2014, Brown was the subject of a second disciplinary proceeding as a result of her failure to follow this overtime mandate order. While Brown initially alleged that this incident was also an episode of retaliation by the defendants, at the close of the trial she acknowledged that her proof of retaliation by Defendant Kuzar had failed and the defendant was dismissed from this case.

Two weeks later, Brown was the subject of another disciplinary citation. Following the factfinding into Brown's email to Deputy Meintel, on January 13, 2015, Brown was involved in an incident in which her personal handcuffs were used to restrain an inmate in the Restricted Housing Unit ("RHU"). The incident was recounted by Brown as follows: Brown responded to a call for assistance in the RHU after a fight between two inmates broke out. Brown assisted by restraining one of the two inmates with her personal handcuffs, which she claims were properly registered with the security office per DOC policy. After the fight had been broken up, the two inmates were taken to the RHU for processing and a strip search. During this time, Brown was waiting outside of the RHU so that she could obtain her handcuffs. Video footage from the RHU depicts Brown waiting outside of the door, and subsequently following the RHU officers out of the RHU to inquire about her handcuffs. At no point does the footage show Brown kicking at the door of the RHU,

6

contrary to some of the statements of other officers who were present. However, footage from inside of the RHU contains audio that captured Brown yelling through the RHU door.

Brown then followed Defendant Davy, who had been involved in the processing of the two inmates, into the officers' dining hall to ask about her handcuffs after the inmates had been processed. She testified that Davy asked her to step outside to talk to him and she declined, although she admitted that she was speaking to him loudly in front of other officers and inmates. Davy left the dining hall, and Brown left several minutes later. Outside of the dining hall, Brown again refused to speak with Davy and instead attempted to call the Pennsylvania State Police to report that her handcuffs had been stolen. She also radioed to Lieutenant Lee to ask permission to go home because of her anxiety. She then spoke with Captain Radle in the RHU, who advised that he was attempting to locate her handcuffs. Ultimately, she ended up speaking with Captain DeLeon who gave her permission to leave the facility. Thus, Brown left J Block to submit a leave slip, during which time her handcuffs had been retrieved and returned to her. Brown left the facility after Captain DeLeon signed her leave slip.[6]

---

[6] It speaks volumes regarding Ms. Brown's frame of mind and degree of her suspicions towards her co-workers at this time that, at trial, she expressed the view that this entire episode was part of an elaborate "set up" by staff. We reject this assertion, which is contradicted by the evidence, and strains credulity since the set up envisioned by Ms. Brown would have required the cooperation of countless

For their part, the defendants recounted this incident differently. On this score, Defendant Benner testified that he was the officer assigned to conduct a factfinding the following day after Davy submitted a DC-121 incident report concerning the encounter with Brown in the dining hall. He stated that he was assigned the factfinding by Captain Radle, and that his job was to gather paperwork, interview the staff named in the incident reports, and send a report to the shift commander. Benner stated that he did not watch the RHU video footage, but that he relied on the DC-121s and the written statements of the staff involved.

Benner testified that the incident report submitted by Davy was predicated by the dining hall incident, in which Davy reported that Brown was yelling at him and other staff about her handcuffs, and that she refused his two orders to speak with him outside. Indeed, Davy testified that when Brown entered the dining hall and began yelling, the staff and inmates who were present were uncomfortable, and he asked Brown to step outside to defuse the situation. He stated that Brown cursed at him, so he stepped outside, and Brown followed several minutes later. Davy stated that he gave Brown another order to stop and talk to him, at which point Brown again yelled profanities at him and radioed that the RHU staff had stolen her handcuffs. As Brown was walking away from him to return to J Block, Davy called Sergeant Cleaver and

---

inmates and staff, all of whom would have had to have staged an inmate fight in the speculative hope that Brown would become involved in the incident, misplace her handcuffs, and then engaged in erratic insubordinate behavior.

asked him to call Brown's block to get the serial number on her handcuffs so that they could check to see if her handcuffs were registered. After checking with Lieutenant Becker in Security, Davy determined that Brown's handcuffs were not registered, in violation of institution policy,[7] and they were ultimately returned to her before she left the facility that day.

In addition to the testimony of Benner and Davy, the factfinding report submitted by Benner contained several DC-121 incident reports regarding the RHU incident and the incident in the dining hall. (Def. Ex. 42). These included reports from Davy, who recounted the incident in the dining hall and the subsequent encounter outside with Brown; CO Killeen, who stated that Brown had been yelling through the RHU door about her handcuffs during the inmate strip search; Sergeant Cleaver, who stated that he checked for Brown's handcuffs and found that they were unregistered; Lieutenant Lee, who stated that he received a call about Brown's handcuffs and that he did not give her permission to leave J Block to go home; CO Swenski, who stated that Brown demanded he call the state police about her handcuffs and he refused; and COs Brant, Reeder, Saez, and Hoffman, who stated that Brown was yelling at Davy in the dining hall and refused his direct order to step

---

[7] At trial it was explained that the policy of registering handcuffs was an integral part of institutional security since a careful inventory of such restraint devices was necessary to ensure that such equipment did not unwittingly fall into the hands of inmates.

outside. The statement given by Brown additionally admitted that she had taken an Ativan that day, after which it was discovered that Brown did not have a gate clearance to have a one-day dose of a controlled substance.

Ultimately, Benner determined that Brown had violated several sections of the code of ethics, including leaving her assigned post, refusing an order from a supervisor, acting unprofessionally toward supervisors and staff, and possessing a controlled substance without a gate clearance. It was also determined that Brown violated the Uniform Policy because her handcuffs were not properly registered. Benner then referred the factfinding to administrative staff for further review, and it was ultimately decided by Superintendent Harry that Brown would face a predisciplinary conference ("PDC"). Benner testified that he had no decisionmaking authority regarding the decision to send Brown to a PDC. In addition, both Benner and Davy testified that they had no knowledge of Brown speaking out on social media or to outside agencies against the DOC or its staff.

Thus, apart from the investigation into the January 13, 2015 incident, Brown was also investigated in December 2014 and January 2015 for violations of the DOC's social media policy. (Def. Ex. 13). Harold Kertes, the Chief of Investigations for the Office of Special Investigations and Intelligence ("OSII"), was responsible for investigating Brown's social media posts, as he was a supervising agent at the time. This investigation was predicated by an anonymous complaint concerning

Brown posting about the DOC, SCI Camp Hill, and several staff members on her Facebook pages. Kertes testified that Brown's personal Facebook page was publicly available for anyone to view, and that there was no disclaimer on her page as required by DOC policy. He captured screenshots of her posts, which included posts about Central Office staff, correctional staff and inmates at Camp Hill, posts that were of a racial nature, and a threat against another officer at Camp Hill, Peggy Corbin. In fact, Corbin filed a DC-121 to report that Brown had threatened her in a Facebook post. Kertes testified that he included this in his ongoing investigation of Brown's social media, and he additionally advised Corbin to talk to the state police about the threat.

Kertes testified that he determined Brown's Facebook posts were inappropriate and violated the social media policy for several reasons. First, he noted that Brown's post appeared to threaten another correctional officer at Camp Hill, which created safety and security concerns, had the potential to create a hostile working environment, and went against the workplace violence policy. Kertes further stated that the posts containing names and pictures of staff and inmates were a major security concern for the DOC. He also found that some of the posts contained content that was of a racial nature in violation of the social media policy. Moreover, because Brown's page did not contain a disclaimer as is required by DOC policy, her posts had the potential to discredit the DOC, its core mission of the care, custody

11

and control of inmates, and those individual who were named in the posts. Kertes stated that he had no say in whether Brown would be disciplined; he merely investigated and passed his January 30, 2015 report on to his director, who then sent an executive summary to Secretary Wetzel.

Thus, given the alleged violations of the ethics code arising from the December 2014 email to Deputy Meintel, Brown's refusal to obey a December 25, 2014 order mandating her to work overtime, the January 13 incident in which it was alleged that she had refused orders, abandoned her post, and brought a controlled substance into the institution without approval, the violation of the uniform policy for having unregistered handcuffs, and the violations of the social media policy, it was recommended that Brown be sent to a pre-disciplinary conference or PDC. (Def. Ex. 44, at 9). This decision was made by the Superintendent at Camp Hill, Laurel Harry. None of the named defendants were involved in this specific decision.

Marie Brunner, a PDC panel member, testified that the PDC had to be rescheduled several times because of Brown's failure to appear. Ultimately, the PDC was held on June 18, 2015. Brown was given notice of the PDC and of the charges she would be facing, which were based on her email to Deputy Meintel in December 2014, her refusal to work mandatory overtime on December 25, 2014, her refusal to obey a direct order from Davy and her inappropriate conduct in the RHU and dining hall, her decision to leave her post without authorization, her possession and use of

a controlled substance, and her social media posts. (Def. Ex. 44). At the PDC, Kertes was responsible for presenting the facts of the social media investigation to the panel, and the panel also considered the prior factfindings related to Brown's other charges. During the PDC, Brown did not raise objections or dispute the charges, but instead decided to leave during the proceedings, and neither she nor her union representative returned for the remainder of the hearing.

The PDC panel ultimately determined that all but two of the charges against Brown were substantiated. Because Brown decided to leave the PDC, the panel relied on Kertes' testimony regarding the social media investigation, as well as the prior factfindings and investigations regarding Brown's conduct in December 2014 and January 2015. Thus, the panel found that Brown had violated the ethics code when she emailed Deputy Meintel, and she also violated several sections of the ethics code when she refused mandatory overtime on December 24, 2014 and on January 13, 2015 when she acted inappropriately in the RHU and dining hall, refused an order from Davy, left her assigned post, and used a controlled substance while on duty. The panel further determined that Brown had violated the uniform policy when she did not properly register her handcuffs, and that she violated the social media policy. (Def. Ex. 43).

On this score, while the panel made the determination regarding whether the charges against Brown were substantiated, the panel did not make a recommendation

as to the level of discipline that Brown should receive. Rather, Elizabeth Lawson, who was counsel for the DOC during this time, testified that the level of recommended discipline was decided by a neutral supervisory official. Lawson explained that the DOC followed a path of progressive discipline, in that the DOC's goal is to retain employees and improve their performance, rather than simply terminate them. Ms. Lawson testified that after the PDC panel substantiated the charges, Brown's file would have gone through several levels of the Human Resources department before the legal department reviewed it, and that the recommendation to terminate would have been made at the HR level. Then, after the legal department reviewed the file, the file was sent to the regional deputy secretary, Michael Wenerowicz, who made the ultimate decision to terminate Brown's employment.

Michael Wenerowicz testified that he was the individual who ultimately signed off on Brown's termination. At the time of his decision, he was employed as the Deputy Secretary of the DOC's Eastern Region. He explained that he received the packet from Brown's PDC and the recommendation that she be terminated. He stated that he reviewed the packet, but because there had been no objections at the PDC due to Brown leaving the hearing and failing to dispute or object to the charges, no objections were brought to his attention. He signed off on the termination recommendation on July 9, 2015, which was then forwarded to the Executive Deputy

Secretary and the Secretary. Once those individuals approved the termination, the file was sent back to HR to draft the termination letter, which Wenerowicz ultimately signed. Thus, approximately six weeks elapsed from the time of the PDC hearing until the date of Brown's termination letter, which according to Ms. Lawson, was a common time frame for reviewing a packet such as this one.

Brown's termination letter was dated July 30, 2015 and was effective on July 31, 2015. (Pl. Ex. 102).[8] The letter outlined the reasons for Brown's termination, which were based on the charges substantiated at the June 2015 PDC. Thus, the letter stated that Brown was being terminated for her multiple violations of the ethics code, the uniform policy, and the social media policy, based on the PDC panel's findings. Wenerowicz testified that while he noted Brown's prior discipline in the letter, it was not a factor that he considered in his decision to terminate her, and he recognized that she had prior commendable performance reviews. However, he stated that after reviewing her file and all of the aggravating and mitigating factors, it was clear that Brown was not taking accountability for her actions and instead was blaming others

---

[8] There were indications that there were published news media accounts on July 30, 2015, detailing allegations that Brown made against the prison. While the temporal proximity of this termination letter and Brown's reported comments in the media initially raised questions, the evidence thoroughly rebuts any suggestions of a causal relationship between Brown's termination and the publication of these statements. It is absolutely clear from the evidence that disciplinary proceedings were instituted long before Brown made these remarks, and the decision to terminate Brown's employment had been made weeks prior to the publication of her statements. There is no evidence of a causal connection between these two events.

for her workplace shortcomings. He also testified that either the January 13, 2015 incident or the violation of the social media policy alone would have been grounds for termination, and the letter advised Brown of the same. Specifically, Wenerowicz testified that even if Brown had not posted on her social media or made complaints to outside agencies, which he was unaware of until he reviewed her termination packet, he would have terminated her solely based on her conduct during the January 13 incident. Ultimately, Wenerowicz stated that given Brown's continued behavior and failure to take responsibility for her actions, the only disciplinary option at that point was for her to be terminated.

Thus began this long and protracted litigation. The plaintiff initially filed her complaint in this district on May 11, 2015, but amended her complaint following her termination. (Docs. 1, 37). After the defendants moved for summary judgment, all of Brown's claims with the exception of her First Amendment retaliation claim were dismissed. (Docs. 75, 95). Additionally, Defendant Noll and the DOC were dismissed with respect to the First Amendment claim. A four-day nonjury trial was then held in this case beginning on June 28, 2021, during which time the parties presented testimony and evidence regarding the First Amendment claim against the remaining individual defendants. After the presentation of evidence had concluded, the plaintiff conceded that she had not proven her claim with respect to Defendant

Kuzar, and judgment was entered in favor of Captain Kuzar. (Doc. 226). We then took the matter under advisement.

After consideration of the evidence and testimony presented at trial, as discussed below, we conclude that the plaintiff has not proven her First Amendment retaliation claim against the remaining individual defendants. Therefore, we will enter judgment in favor of the individual defendants.

## III.   <u>Discussion</u>

Brown's sole remaining claim against the defendants is one of First Amendment retaliation, in which she has alleged that the individual defendants retaliated against her for speaking about matters of public concern. Specifically, Brown claims that she reported wrongdoings, including the use of cell phones by inmates and other inappropriate conduct, to the FBI, the Governor's Office, and the U.S. Attorney's office in December of 2014. She asserts that the defendants then retaliated against her for filing those reports by engaging in conduct that included Meintel's inspection of J Block, the mandated overtime shift on Christmas Day in 2014, and fabricating the January 13, 2015 RHU handcuffing incident, all of which played a part in her ultimate termination. She also posted about alleged wrongdoings on Facebook, filed two criminal complaints against the DOC in April and July of 2015, and on July 30, 2015, she spoke to a news organization about the retaliation

she was suffering at work. She claims that these reporting incidents also factored into her termination.

After a review of all of the evidence, we conclude that Brown has not proven that the remaining defendants violated her First Amendment rights. Specifically, Brown has not shown that Defendants Benner, Davy, or Meintel had knowledge that she engaged in protected First Amendment activity or had any role in deciding her termination. Moreover, Brown has not shown that Defendant Kertes had any involvement in the decision to terminate her employment. Finally, although it is undisputed that Defendant Wenerowicz made the decision to terminate Brown's employment, there is no evidence that this decision was causally related to any protected First Amendment activity. Therefore, we will enter judgment in favor of the defendants.

## A. First Amendment Retaliation – Legal Standards

In order to state a claim of retaliation under the First Amendment, a plaintiff must show: "(1) that [she] engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." Lauren W. ex rel Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citing Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006)). Stated differently, the plaintiff must demonstrate

that the protected speech was "a 'substantial factor' in the alleged retaliatory action."

McAndrew v. Bucks County Bd. Of Comm'rs, 183 F.Supp.3d 713, 731 (E.D. Pa.

2016) (citing Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009)). If a plaintiff

makes such a showing, the burden then shifts to the defendant to show that, even if

the protected speech had not taken place, it would have taken the same action. Id.

In determining the constitutional protections of the First Amendment with

respect to public employee speech, two inquiries guide our interpretation:

> The first requires determining whether the employee spoke as a citizen
> on a matter of public concern. See [Pickering v. Bd. Of Ed. of Twp.
> High School District 205, 391 U.S. 563, 568 (1968)]. If the answer is
> no, the employee has no First Amendment cause of action based on his
> or her employer's reaction to the speech. See Connick, supra, at 147,
> 103 S. Ct. 1684.  If the answer is yes, then the possibility of a First
> Amendment claim arises. The question becomes whether the relevant
> government entity had an adequate justification for treating the
> employee differently from any other member of the general public. See
> Pickering, 391 U.S., at 568, 88 S. Ct. 1731.

Garcetti v. Ceballos, 547 U.S. 410, 418 (2006) (internal citations omitted.) Thus,

when the plaintiff is a public employee, her speech is protected when she (1) speaks

as a citizen, (2) speaks about a matter of public concern, and (3) the employer did

not have a justification for treating her differently than a member of the public. See

Reilly v. City of Atlantic City, 532 F.3d 216, 228 (3d Cir. 2008); Hill v. Borough of

Kutztown, 455 F.3d 225, 241-42 (3d Cir. 2006).

Although a citizen who enters government service "must accept certain

limitations on his or her freedom," the Supreme Court has recognized that "a citizen

who works for the government is nonetheless a citizen." <u>Garcetti</u>, 547 U.S. at 419.

However, the Supreme Court has held that "when public employees make statements

pursuant to their official duties, the employees are not speaking as citizens for First

Amendment purposes, and the Constitution does not insulate their communications

from employer discipline." <u>Lane v. Franks</u>, 573 U.S. 28, 237 (2014). Factors to

consider when making a determination about whether the employee spoke pursuant

to her duties include the employee's special knowledge acquired through her job;

whether the complaints were raised "up the chain of command"; whether it was part

of the employee's responsibilities to raise the complaint; and whether the speech is

in furtherance of the employee's duties. <u>Tayoun v. City of Pittston</u>, 39 F. Supp. 3d

572, 577-78 (M.D. Pa. 2014) (quoting <u>Kimmett v. Corbett</u>, 554 F. App'x 106, 111

(3d Cir. 2014) (internal citations omitted)).

Whether a public employee's speech is made "pursuant to official duties" is a

mixed question of law and fact. <u>Flora v. County of Luzerne</u>, 776 F.3d 169, 175 (3d

Cir. 2015) (citing <u>Dougherty v. School Dist. of Phila.</u>, 772 F.3d 979, 988 (3d Cir.

2014)). The inquiry is a practical one and does not depend on a public employee's

job description or list of official duties. <u>Garcetti</u>, 547 U.S. at 424-25. Although

<u>Garcetti</u> did not announce a comprehensive approach for determining whether

speech was made pursuant to an employee's job duties, the Supreme Court has made

clear that courts are to consider the responsibilities the employee assumed when she

"went to work and performed the tasks [she] was paid to perform." Id. at 422. The Third Circuit has explained further: "[T]he responsibility of a district court in evaluating whether a public employee's speech was made as a private citizen is to ask whether the speech at issue was 'outside the scope of his ordinary job responsibilities.' " Flora, 776 F.3d at 179 (quoting Lane, 573 U.S. at 238). The controlling factor is whether the statements were made pursuant to the employee's job duties, in other words, "the utterances were among the things that the employee 'was employed to do.' " Id. at 177 (quoting Garcetti, 547 U.S. at 421). However, "whether an employee's speech 'concern[s] the subject matter of [her] employment is 'nondispositive' under Garcetti.' " Dougherty, 772 F.3d at 989 (quoting Garcetti, 547 U.S. at 421). Courts should also consider the manner of the speech at is at issue, more than the subject matter itself, and "specifically whether the plaintiff [was] expected, pursuant to [his or her] job duties, to make the speech that is at issue." Jerri v. Harran, 625 F. App'x 574, 580 (3d Cir. 2015) (internal quotation marks and citation omitted); see also Barnes, 2016 WL 5376023, at *5.

With respect to the question of whether the employee's statement involved a matter of public concern, a court must look at the content, form, and context of the employee's statement to determine whether the speech discusses a matter of public concern. Connick v. Myers, 461 U.S. 138, 147-48 (1983); Gorum v. Sessoms, 561 F.3d 179, 187 (3d Cir. 2009). Generally, speech addressing a matter of public

concern will relate to "a subject of general interest and of value and concern to the public." <u>Lane</u>, 573 U.S. at 241 (quoting <u>Snyder v. Phelps</u>, 562 U.S. 443, 453 (2011)). The Third Circuit has held that the "employee's speech will be a matter of public concern if it can be fairly considered as relating to any matter of political, social, or other concern to the community." <u>Baldassare v. State of N.J.</u>, 250 F.3d 188, 195 (3d Cir. 2001) (quoting <u>Green v. Phila. Hous. Auth.</u>, 105 F.3d 882, 885-86 (3d Cir. 1997)).

Lastly, the third factor involves a balancing between "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." <u>Pickering</u>, 391 U.S. at 568. The Supreme Court has stated that, "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.' " <u>Garcetti</u>, 547 U.S. at 420 (quoting <u>Connick</u>, 461 U.S. at 154).

Speech may be protected even if it is made within the workplace, <u>Garcetti</u>, 547 U.S. at 420-21, and speech that merely relates to the employee's job duties may still qualify as protected in some circumstances. <u>Flora</u>, 776 F.3d at 176-79 (rejecting the district court's application of a "related to" standard for determining whether public employee speech is protected). "The scope and content of a plaintiff's job

responsibilities is a question of fact, but the ultimate constitutional significance of those facts is a question of law." Id. at 175.

Although there is not an exhaustive list of factors that will govern in each particular case, the Third Circuit has offered some guidance that may inform the Court's inquiry that is required following Garcetti:

> (1) whether the employee's speech relates to special knowledge or experience acquired through [the employee's job] ...; (2) whether the employee raises complaints or concerns about issues relating to [the employee's] job duties up the chain of command at his workplace ...; (3) whether the speech fell within the employee's designated responsibilities ...; and (4) whether the employee's speech is in furtherance of [the employee's] designated duties, even if the speech at issue is not part of them.

Kimmett v. Corbett, 554 F. App'x 106, 111 (3d Cir. 2014) (internal quotation marks, citations, and footnote omitted).

With respect to the third element of a First Amendment retaliation claim, there are three ways in which a plaintiff can establish causation for a First Amendment retaliation claim, showing: "(1) an 'unusually suggestive temporal proximity' between the speech and the alleged retaliatory conduct; (2) a 'pattern of antagonism coupled with timing'; or (3) that the 'record as a whole' permits the trier of fact to infer causation." McAndrew, 183 F.Supp.3d at 737 (quoting DeFlaminis, 480 F.3d at 267). Additionally, an unusually suggestive temporal proximity, by itself, can be enough to infer causation. LeBoon v. Lancaster Jewish Community Center Ass'n,

503 F.3d 217, 232 (3d Cir. 2007) (citing <u>Clark County Sch. Dist. v. Breeden</u>, 532

U.S. 268, 273-74 (2001)). However,

> While " 'suggestive temporal proximity' is *relevant* to establishing a
> causal link between protected conduct and retaliatory action ... in First
> Amendment retaliation cases," <u>Ambrose v. Twp. of Robinson, Pa.</u>, 303
> F.3d 488, 494 (3d Cir. 2002) (citations omitted) (emphasis added), it is
> not dispositive of the issue. <u>See</u> <u>DeFlaminis</u>, 480 F.3d at 267. Rather, a
> plaintiff may also establish the requisite causal connection by showing
> "a pattern of antagonism coupled with timing to establish a causal link."
> <u>Id.</u> (citing <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 503–04 (3d
> Cir. 1997); <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920–21 (3d Cir.
> 1997)). The plaintiff may establish that causal link by offering evidence
> which "gleaned from the record as a whole" could lead a reasonable
> fact-finder to infer causation. <u>Id.</u> (citing <u>Farrell v. Planters Lifesavers
> Co.</u>, 206 F.3d 271, 281 (3d Cir. 2000)). Finally, Plaintiff is not required
> to show "but for causation;" rather, she is required to show that the
> "exercise of free speech rights played 'some substantial role' in the
> employer's decision." <u>Marrero v. Camden Cty. Bd. of Social Services</u>,
> 164 F.Supp.2d 455, 469 (D.N.J. 2001) (citing <u>Suppan</u>, 203 F.3d at 236).

<u>Malone v. Economy Borough Municipal Authority</u>, 669 F.Supp.2d 582, 603 (W.D.

Pa. 2009). Ultimately, however, a plaintiff must establish that the protected speech

was "a substantial or motivating factor in the alleged retaliation." <u>Dougherty v. Sch.</u>

<u>Dist. of Phila.</u>, 772 F.3d 979, 986 (3d Cir. 2014).

Finally, even if a plaintiff presents evidence that supports a colorable First

Amendment retaliation claim, that claim will still fail if the defendants show that

they would have taken the same disciplinary action absent the plaintiff's protected

speech. Simply put if a plaintiff carries her initial burden of proof on a First

Amendment retaliation claim:

[T]the burden shifts to the defendant to prove the same decision defense. See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 285–86, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) ("The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct."); see also Suppan v. Dadonna, 203 F.3d 228, 236 (3d Cir. 2000) ("[T]he defendants, in proving 'same decision,' must prove that the protected conduct was *not* the but-for cause.") (emphasis in original). A defendant accomplishes this by "demonstrating by a preponderance of the evidence that the same action would have been taken even in the absence of protected conduct." Watters v. City of Phila., 55 F.3d 886, 892 (3d Cir. 1995). "While but-for causation is the ultimate question, it is the defendants' burden to prove lack of but-for causation." Suppan, 203 F.3d at 236.

McAndrew v. Bucks Cty. Bd. of Commissioners, 183 F. Supp. 3d 713, 738–39 (E.D. Pa. 2016).

### B. Brown has Not Shown that the Remaining Defendants Violated Her First Amendment Rights.

Turning to the case before us, we find that Brown has not proven that the remaining individual defendants violated her First Amendment rights.

At the outset, we note that some of what Brown was speaking out about publicly would not constitute protected activity under the First Amendment. It is well settled that "complaints up the chain of command about issues related to an employee's workplace duties—for example, possible safety issues or misconducts by other employees—are within an employee's officials duties" and are not protected by the First Amendment. Morris v. Phila. Housing Auth., 487 F. App'x 37, 39 (3d Cir. 2012) (citing Foraker v. Chaffinch, 501 F.3d 231, 240 (3d Cir. 2007);

Hill, 455 F.3d at 242); Moreover, "[i]f the speech relates only to [the employee's] personal interest," the speech is not protected by the First Amendment because "government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary." Borden v. Sch. Dist. of Twp. Of E. Brunswick, 523 F.3d 153, 168 (3d Cir. 2008) (quoting Connick, 461 U.S. at 146) (internal quotations omitted)); see also Frazier v. City of Phila., 441 F.Supp.3d 76, 87 (E.D. Pa. 2020) ("Specifically, airing of 'merely personal grievances' is not of public concern") (internal citation and quotation omitted).

Here, we cannot conclude that all of Brown's complaints regarding what she believed were issues with the DOC constituted a matter of public concern. On this score, we find that Brown's complaints and/or social media posts about her separation requests, misconduct of other employees, being mandated to work overtime, and the alleged discovery of feces in on the floor in a housing unit were not a matter of public concern, but rather implicated matters of personal interest to Brown. In our view, these matters stemmed from Brown's personal issues with her colleagues or amounted to workplace grievances but did not amount to an attempt "to bring light to actual or potential wrongdoing or breach of public trust." Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993) (quoting Connick, 461 U.S. at 148) (internal quotations omitted). Indeed, it appears that Brown "is attempting to turn a workplace dispute into a constitutional grievance." Kowalewski v.

Susquehanna County, 2018 WL 656011 (M.D. Pa. Feb. 1, 2018) (citing Connick, 461 U.S. at 146-48). Accordingly, to the extent that Brown bases her retaliation claim on these instances that she reported such personal workplace disputes, we find that these reports do not constitute matters of public concern as is required for First Amendment protections.

However, even if some, or all, of Brown's speech can be characterized as speaking about matters of public concern and thus protected by the First Amendment, we find that Brown has not shown a causal connection between her speech and the adverse action taken against her when she was terminated. As we have explained, in order to show such a causal connection, Brown must show that her speech "was a substantial or motivating factor" in the decision to terminate her employment. Dougherty, 772 F.3d at 986. On this score, we must make two inquiries, asking "did the defendants take an adverse action to the public employee, and, if so, was the motivation for the action to retaliate against the employee for the protected activity." LaTorre v. Downingtown Area Sch. Dist., 253 F.Supp.3d 812, 825 (E.D. Pa. 2017) (quoting Schneck v. Saucon Valley Sch. Dist., 340 F.Supp.2d 558, 568 (E.D. Pa. 2004) (internal quotations omitted)).

In the instant case, the plaintiff has not shown that any of the defendants, with the exception of Wenerowicz, took an adverse action against her. It is undisputed that Wenerowicz was the decisionmaker regarding Brown's termination. However,

27

the plaintiff has not provided evidence to show that any of the remaining defendants had a part in deciding that she would be terminated. We recognize that Brown premises this retaliation claim on her termination, but she also initially contended that each of the incidents for which she received discipline—the December 2014 email to Meintel, the December 25, 2014 mandated overtime, the January 13, 2015 incident, and the social media investigation—were part of a larger scheme by the defendants to terminate her employment. One this score, Defendants Benner, Davy, and Meintel all testified that they were unaware that Brown had made any complaints to outside agencies or that she posted on her social media. In addition, these defendants testified that they played no role in deciding whether Brown would be disciplined. Kertes testified that he became aware of Brown's social media postings from an anonymous complaint and that he was assigned to investigate her social media, but that he had no decisionmaking authority with respect to the discipline Brown received.

Thus, to the extent that Brown claims these incidents were all part of a retaliatory effort to terminate her employment, she has not provided evidence to support this claim. On this score, Deputy Meintel testified that he had no knowledge of any complaints made by Brown prior to his inspection of J Block on December 4, 2014. While we credit Brown's testimony that she informed Meintel at some point about her separation request from inmate Heizman, Brown has not provided any

evidence to show that the block inspection was premised on her separation request, and the evidence rebuts the inference she asks us to draw since Brown was not even on duty on the date of this inspection. Indeed, we find it difficult to discern a causal connection between this incident and any of Brown's protected speech. Thus, given the undisputed fact that Brown was not working the day of the inspection, her First Amendment retaliation claim stemming from this incident fails.

Further, Brown now concedes that there is no legal or factual basis for drawing an inference of retaliation from Defendant Kuzar's decision to submit an incident report after Brown refused an order mandating her to work overtime on December 25, 2014. Therefore, this claim also fails.

Regarding the January 13, 2015 incident, Defendant Benner testified that he was randomly assigned to conduct a factfinding into the incident by Captain Radle, as he was not working on the day of the incident, but that his only role was to take statements, review the DC-121s from that day, and pass his report on for administrative review. Similarly, Defendant Davy testified that his only involvement was writing a DC-121 regarding Brown's conduct toward him in the officers' dining hall on January 13, 2015. Davy stated that he did not have any decisionmaking authority regarding whether the incident would be sent to a PDC. Moreover, Brown has not provided any evidence to suggest that these defendants knew of her protected activity, or that they had any role in the decision to terminate her. Rather, Brown

asserts without support that these individuals were part of a larger plan by the DOC and its staff to set her up to be terminated, going as far as to claim that the inmate fight that led to the RHU incident was fabricated in order to give the DOC reason to terminate her employment.

Without supporting evidence, we simply cannot credit this assertion by Brown when there is evidence to support the testimony that Defendants Benner and Davy were only tangentially involved, in that Davy wrote the DC-121 that led to Benner's investigation. However, there is no evidence to even suggest that either of these defendants had knowledge of Brown's complaints or had the authority to send Brown to a PDC or to terminate her employment. Accordingly, we cannot conclude that Defendants Benner and Davy retaliated against Brown for engaging in protected speech under the First Amendment.

Similarly, we cannot conclude that Defendant Kertes retaliated against Brown for engaging in protected speech. On this score, to the extent that Brown's social media posts amounted to protected speech under the First Amendment, it is undisputed that Kertes knew about Brown's social media posts because he was the OSII agent who investigated an anonymous complaint about Brown's social media. It is also undisputed that Kertes testified at the PDC hearing, which ultimately led to Brown's termination. However, Brown has not provided any evidence to show that Kertes had any decisionmaking authority with respect to her termination. Rather,

Kertes investigated Brown's social media posts, concluded that she had violated the DOC's social media policy, and passed his report on to his director. Kertes had no say in whether Brown's violation of the social media policy would result in a PDC or in Brown's termination, and Brown has not provided us with evidence to the contrary. Accordingly, we cannot conclude that Kertes retaliated against Brown or violated her First Amendment rights.

Finally, as we have explained with respect to Defendant Wenerowicz, it is undisputed that Wenerowicz was the individual who ultimately terminated Brown's employment. However, Brown has not shown that her protected speech was a substantial or motivating factor in his decision to terminate her. On this score, Wenerowicz testified that he had no knowledge of her complaints and/or social media posts until he received the packet recommending that Brown be terminated. At that point in time, the Superintendent had already recommended that Brown be terminated, and Wenerowicz was responsible for reviewing the packet and signing off on the ultimate decision. Indeed, while it is undisputed that Brown spoke to a news outlet on July 30, 2015, the day her termination letter was dated, testimony from Weneorwicz and Ms. Lawson indicate that the decision to terminate Brown's employment was made weeks prior to July 30. Moreover, and significantly, Wenerowicz testified that he would have terminated Brown solely based on her conduct on January 13, 2015, conduct which was entirely unrelated to any First

Amendment protected activity, regardless of whether she posted anything on social media or made outside complaints about the DOC. In fact, the termination letter that Brown received stated that her actions on January 13, standing alone, warranted termination.

As we have explained, although Brown has asserted that this January 13 incident was fabricated as a result of her protected activity in order to terminate her, there is simply no evidence to support this assertion. Accordingly, we cannot conclude that Defendant Wenerowicz terminated Brown's employment because she engaged in any protected activity. Rather, Wenerowicz testified credibly that Brown was terminated because of her multiple failures to take responsibility for her actions, and because her actions, if left undisciplined, could affect the safety and security of the institution and those who worked there. Accordingly, Wenerowicz concluded that the DOC's only option was to terminate Brown's employment. It then follows that even if we were to conclude that Brown's protected activity played some role in the adverse action taken against her, the defendants have provided evidence showing that the same action would have been taken regardless of any retaliatory animus. Dougherty, 772 F.3d at 986.

In sum, what the evidence in this case shows is that Brown made reports of what she believed to be wrongdoings inside the prison between December 2014 and July 2015. The evidence also indicates that Brown was involved in several incidents

that resulted in her being disciplined at work, sent to a PDC, and ultimately terminated. However, the evidence does not show that these disciplinary actions were in any way connected to Brown's complaints. Rather, it is clear that Defendants Benner, Davy, Kertes, and Meintel had no authority to discipline Brown, send her to a PDC, or terminate her employment, and that these defendants were unaware of any of Brown's complaints to outside agencies regarding wrongdoings within the prison. It is equally clear that Defendant Wenerowicz signed off on the recommendation that Brown be terminated after he determined that Brown was not taking responsibility for her own workplace shortcomings.

Therefore, Brown's First Amendment retaliation claims fail because: first, she has not shown that many of the workplace disputes that she had entailed matters entitled to First Amendment protection; second, there is a paucity of proof that the disciplinary actions taken against Brown were causally related to any First Amendment protected behavior on her part; and third, the defendants have "demonstrate[ed] by a preponderance of the evidence that the same action would have been taken even in the absence of protected conduct." Watters, 55 F.3d at 892. Thus, there is simply no evidence that these defendants violated Brown's First Amendment rights.

33

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, we find that the plaintiff has failed to prove that the defendants violated her First Amendment rights. Thus, we will enter judgment in favor of the remaining individual defendants.

An appropriate order follows.

Submitted this 21st day of July 2021.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge
